Marcus **MUNGO** (98–A–4470), Petitioner,

v.

George **DUNCAN, Superintendent of Great Meadow Correctional Facility, Respondent.**

Nos. 02–CV–5586 (JBW), 03–MISC–0066 (JBW).

United States District Court, E.D. New York.

Aug. 8, 2003.

Amy Merrill Appelbaum, Office of the D.A., Kings County, Brooklyn, NY, for Respondent.

## MEMORANDUM, JUDGMENT & ORDER

WEINSTEIN, Senior District Judge.

A hearing was held in this matter to determine whether petitioner is entitled to a writ of habeas corpus. Petitioner was present by telephone. The petition for a writ of habeas corpus is denied for the reasons stated orally on the record. Like so many cases, this one leaves the impression that petitioner may well be innocent— as are in the order of one percent, or many thousands, of the millions of individuals in criminal custody in the United States. The limited power of this court does not permit it to release a prisoner on the hunch that he is one of the innocent in our prisons. This memorandum briefly addresses petitioner's claims.

### I. Facts and Procedural History

The following facts are taken from the trial record.

On June 23, 1997, at approximately 1:20 a.m., Brent Arthur was shot on Euclid Avenue in Brooklyn. He died approximately one hour later. The cause of death was a gunshot wound resulting from a bullet that entered his lower right chest and perforated his chest, liver, and one of his lumbar vertebrae. Petitioner was put on trial primarily for the murder of Arthur. The only evidence identifying petitioner as the shooter were statements made by Arthur before his death and admitted at trial under the excited utterance exception to the hearsay rule.

Testifying at trial as part of the state's case were two individuals on Euclid Avenue at approximately the time of the shooting (the "bystanders"), two police officers arriving shortly after shots were fired, several detectives, and the medical examiner.

The two bystanders testified to hearing what they described as firecrackers or gunshots. They then saw Arthur running up the street holding his stomach as he was chased by a male in a light colored shirt with hair variously characterized as puffy, fuzzy, wild, an Afro, or dreadlocks. One of the bystanders described the second man as African–American and saw a "flame" coming from his hands.

The two police officers, Sergeant Robert Delaney and Police Officer Dante Cavallo, were plainclothes officers working on an unrelated case. They heard gunshots while sitting in an unmarked police car disguised as a yellow taxi cab at the corner of Euclid Avenue and Pitkin Avenue. They responded to the gunshots, and were waved down by Arthur on Euclid Avenue approximately three-quarters of a block away from where they had been parked. Arthur said, "Officer, I've been shot," and got into their cab. The officers also saw two figures in light colored shirts running away. Sergeant Delaney at trial further described the figures as black males, one of whom had hair that stood "on end." When asked by Sergeant Delaney, Arthur

identified the men running away as his assailants.

It is not surprising that the deceased treated the "cab" as a police patrol car. Based on judicial notice of trial and habeas corpus proceedings as well as knowledge of Brooklyn, this court recognizes what most residents of ethnic neighborhoods in this borough know—that police personnel sitting in plainclothes in vehicles of various descriptions are police officers on duty.

Testimony by the bystanders and the officers was inconsistent with respect to the number of people observed and the relative locations of the parties during this period of time, and to the amount of time that elapsed before the officers drove away. Neither the bystanders nor the police were able at any time to identify petitioner as one of the individuals present on Euclid Avenue at the time Arthur was shot.

The officers attempted to follow the men running away, but immediately lost sight of them. At Arthur's direction, the officers drove toward the "projects," a building at 1220 Sutter Avenue several blocks from where Arthur got into the officers' cab. When they reached Sutter Avenue just past Euclid, they saw two African–American men standing on the service entrance road to the projects. One of the men had short dreadlocks and wore a gray t-shirt; the other wore a white multicolored t-shirt. When asked by Sergeant Delaney "How about those guys?," Arthur identified the two as the men who had shot him.

As the officers' cab approached, the men ran into the building. The officers followed on foot. Marcus Mungo, the petitioner, and LeShawn Stewart were found standing in a recessed door frame in a side hallway on the fourth floor, which was the floor on which Stewart lived. Petitioner was wearing a gray t-shirt and had dread-

locks. Stewart was wearing a white multi-colored t-shirt and had short hair. Both were wearing shorts.

Petitioner and Stewart were handcuffed and frisked. No gun was found. No property at all was found on petitioner. The area was searched extensively, but no weapon was recovered. Four .22 caliber shell casings and one .22 caliber live cartridge were found on the ground in front of where the bystanders were when they saw Arthur running on Euclid Avenue. Ballistics showed that all four casings were fired from the same firearm. The bullet recovered from Arthur's body was also .22 caliber. Without recovering the weapon, it was not possible to tell whether that bullet was fired from the same weapon as were the casings.

Officer Cavallo took Stewart and petitioner downstairs and outside to where Arthur was lying on the ground next to the cab, bleeding and in pain. Cavallo took Stewart over to Arthur, and asked "Is that the guy who shot you?". Arthur answered, "yes." Cavallo then escorted petitioner to Arthur, asked the same question, and got the same answer. When Cavallo told Arthur that he had to know exactly which of the two men had shot him, Arthur answered that it was the "guy in gray." Arthur said subsequently "they" tried to rob me. Arthur remained lying on the ground during this entire exchange. An ambulance was called either shortly before or shortly after the identifications were made. Arthur died at the hospital, less than an hour after accusing the petitioner.

Petitioner and Stewart were arrested. They were taken to the police precinct. The court did not allow testimony at trial, constituting indirect hearsay, concerning why Stewart was arrested.

Starting at about 6:00 p.m. on the day of the shooting and continuing to early the

next morning, petitioner made several statements to the police; they provided an independent connection between petitioner and the deceased and buttressed the identification by showing that the deceased knew petitioner well enough so as not to have misidentified him, as he might a never-before-seen stranger. Petitioner said that he knew Arthur, who had given him money for food on occasion and a room to live in at 523 Euclid in exchange for keeping the second floor of the building clean. A police detective testified at trial that tax records indicated Arthur owned the building at 523 Euclid. Petitioner stated that he had decided to move out of that room and was going to spend the night with Stewart in his apartment at 1220 Sutter Avenue. He left 523 Euclid at around 11:00 on the evening of June 22nd. According to petitioner's story, early in the morning on the 23rd he was standing outside the projects with Stewart. Stewart began to run, so he ran with him. The remainder of petitioner's statements, concerning his arrest and Arthur's identification of him, essentially mirror the testimony given by the police officers at trial.

Stewart was brought before the grand jury, but was not indicted. Petitioner was charged with two counts of murder in the second degree (intentional murder and depraved indifference murder), one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree. Following a jury trial, petitioner was convicted of one count of murder in the second degree (depraved indifference murder) and sentenced to a term of imprisonment of twenty-five years to life.

On direct appeal petitioner argued first that the trial court improperly permitted the state to introduce into evidence Arthur's statements after he was shot identifying defendant as his assailant and second that his sentence was excessive. Petitioner's conviction and sentence were affirmed by the Appellate Division. *See People v. Mungo*, 287 A.D.2d 523, 731 N.Y.S.2d 632 (2d Dep't 2001). Leave to appeal to the New York Court of Appeals was denied, and petitioner's application for reconsideration of the denial of his application for leave to appeal was dismissed. *See People v. Mungo*, 97 N.Y.2d 685, 738 N.Y.S.2d 301, 764 N.E.2d 405 (2001); *People v. Mungo*, 98 N.Y.2d 639, 744 N.Y.S.2d 768, 771 N.E.2d 841 (2002). No state collateral attack on the judgment of conviction has been made.

In the instant application for a writ of habeas corpus, petitioner claims (1) that the trial court erred in allowing the introduction into evidence of statements made by the victim identifying petitioner as his assailant; and (2) that his sentence was excessive.

## II. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court

may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir.2002). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane,* No. 98 CIV. 1604, 2000 WL 12142, at *2, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).

### IV. Procedural Bar

■ A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

■ If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d

308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

■ When a state court "says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved." *Glenn v. Bartlett*, 98 F.3d 721, 724–25 (2d Cir.1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.*, 235 F.3d 804, 810 (2d Cir. 2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." *Su v. Filion*, 335 F.3d 119, 126 (2d Cir.2003) (citing *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir.2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." *Id.*

## V. Certificate of Appealability

This opinion complies with *Miranda v. Bennett*, 322 F.3d 171, 175–77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure. No other issue open to consideration by this court has merit. *See Sumner v. Mata*, 449 U.S. 539, 548, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit").

A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. **Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit.** *See* 28 U.S.C. § 2253; *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

## VI. Analysis of Claims

All of petitioner's present claims have been exhausted. None are procedurally barred. They may be addressed on the merits by this court.

■ Petitioner's main claim is that the trial court erred in allowing the introduction into evidence of statements made by the victim identifying petitioner as his assailant. For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant.' " *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985) quoting *Nettles v. Wainwright*, 677 F.2d 410, 414–15 (5th Cir. 1982). This test applies post-AEDPA. *See Wade v. Mantello*, 333 F.3d 51 (2d Cir.2003).

The following testimony by Police Officer Cavallo with respect to Arthur's identification of petitioner as the shooter was allowed. The trial court's ruling on the

admissibility of the victim's out of court statements took place off the record, but it is not contested that the statements were admitted under the "excited utterance" exception to the hearsay rule.

Q. When Mr. Arthur approached the car, what happened next?

A. He came to my rear window. He looked in the car and said: "Officer, I have been shot."

Trial Tr. at 42.

Q. Once Mr. Arthur got in the car, tell us what happened immediately after that?

A. Sergeant Delaney said, "Who shot you? Those guys running?" And he said, "Yeah those guys."

*Id.*

Q. And, when your car drove down onto Sutter Avenue, what if anything happened next after you saw these two people?

A. Sergeant Delaney said how about those guys and ... Mr. Arthur said very excitedly, "those are them."

*Id.* at 43–44.

Q. When you went back outside, explain to us how you conducted this show up?

Tell us exactly what you did?

A. I brought Mr. Stewart over to where Mr. Arthur was. I went over to Mr. Arthur, and I said, "Is that the guy that shot you?" He answered "yes."

*Id.* at 52.

Q. Now, after he said that about Mr. Stewart, what did you do right after that?

A. I did the same thing with Mr. Mungo. I brought him in front of the bumper. I went over to Mr. Arthur and said, "Is this the guy that shot you?"

He said "yes."

Q. After he said yes to Mr. Mungo shooting him, what did you do next?

A. I went back to him. I said, "I need to know exactly which one shot you." And he said "the guy in gray."

*Id.* at 53. Essentially the same statements were testified to by Sergeant Delaney. *See id.* at 199, 202, 210–11. The two bystanders also testified at trial to hearing the victim say "Officer, officer, they got me," or "Officer, officer, they shot me." *Id.* at 272, 301.

Out-of-court statements are generally excluded as hearsay because the declarant is not present in court to state his or her exact words and to allow the trier of fact to judge his or her demeanor and credibility—that is, his or her ability to observe, remember, and describe accurately and desire to tell the truth. Cross-examination by the other party's lawyer in defendant's and the jury's presence to test the accuracy of a statement is heavily relied upon under our system of criminal justice. Certain exceptions to the hearsay rule are allowed because the out-of-court statements are deemed as a class (or individually in some few cases) to possess some other, independent assurance of their reliability. An "excited utterance" is recognized as a traditional exception to the hearsay rule under both New York and federal law. *See People v. Brown,* 70 N.Y.2d 513, 522 N.Y.S.2d 837, 517 N.E.2d 515 (1987); *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); Fed.R.Evid. 803(2). It is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R.Evid. 803(2); *see also People v. Brown,* 70 N.Y.2d 513, 519–20, 522 N.Y.S.2d 837,

517 N.E.2d 515 (1987) ("made 'under the stress of excitement caused by an external event' and not 'under the impetus of studied reflection'" (quoting *People v. Edwards*, 47 N.Y.2d 493, 497, 419 N.Y.S.2d 45, 392 N.E.2d 1229 (1979))).

The victim's statements in the instant matter likely would have been admissible in the federal courts under both the dying declaration as well as the excited utterance exception to the hearsay rule. They were probably not admissible in the state courts as dying declarations because the state courts are in this instance, as in many others, more protective of a defendant's rights than are the federal courts.

■■■■■ A statement made by an unavailable witness that is admissible under a hearsay exception meets the requirements of the Confrontation Clause of the United States Constitution if the statement "bears adequate indicia of reliability." *Idaho v. Wright*, 497 U.S. at 814, 110 S.Ct. 3139. Where a statement falls within a "firmly rooted exception" to the hearsay rule, under the law as pronounced by the Supreme Court that statement should be assessed by the trial court to be sufficiently reliable without any further showing of "particularized guarantees of trustworthiness." *Id.* An excited utterance is a firmly rooted hearsay exception and therefore carries sufficient indicia of reliability to inevitably satisfy the Confrontation Clause. *See White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *United States v. Tocco*, 135 F.3d 116, 128 (2d Cir.1998). The theory is that under the stress of the excitement recently caused by an exciting event the declarant is unlikely to have had time or to fabricate.

The exception itself, particularly as applied in cases like the instant one, is of dubious merit. The very exciting event and excitement of the extra-judicial declarant may have caused him to make a mistake of observation, recollection or recounting (and even may have created an animus leading to a lie).

In assessing the instant claim on direct appeal, the Appellate Division held:

> The trial court properly admitted the statements made by the decedent naming the defendant as his assailant under the excited utterance exception to the hearsay rule.... The surrounding circumstances reasonably justify the conclusion that the decedent's remarks were not made under the impetus of studied reflection and that the decedent was still under the continuing stress and excitement of the shooting.

*People v. Mungo*, 287 A.D.2d 523, 731 N.Y.S.2d 632 (2001) (internal citations omitted). The Appellate Division's conclusion that Arthur's statements identifying Mungo as his shooter were made while under the continuing stress and excitement of his fatal shooting and therefore admissible as excited utterances was not unreasonable in light of the facts before it. Under the letter of the law, then, the statements, as excited utterances, bore adequate indicia of reliability to satisfy the Confrontation Clause. Because admission of the identifying statements was not constitutional error, petitioner was not denied a fundamentally fair trial. The clear limits on this courts' habeas corpus power both by statute and Supreme Court decisions leads to the conclusion that habeas relief is not warranted on this claim.

■■■■■ Petitioner next claims that his sentence was excessive. The assertion that a sentencing judge abused his or her discretion in sentencing is generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir.1977) (citing *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)). A challenge to the

term of a sentence is not a cognizable constitutional issue if the sentence falls within the statutory range. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992). Petitioner's sentence of twenty-five years to life, although the maximum allowable under state law, fell within the permitted statutory range. *See* N.Y. Penal Law §§ 125.25 (murder in the second degree is a class A–I felony); 70.00(2)(a) (maximum term of sentence for a class A felony shall be life imprisonment); 70.00(3)(a)(i) (minimum period of imprisonment for a class A–I felony shall be not less than fifteen and not more than twenty–five years). There is no non-frivolous federal sentencing question for this court to address.

Despite the fact that this court cannot grant habeas relief on petitioner's claims as presented, this case is disquieting. It is one illustration of the fallacy of the assumption that out of court "excited utterances," as a class, should be presumed reliable without further examination of the trustworthiness of the statements in the context of the case as a whole, and, having been admitted, are sufficient to convict as an eyewitness account. *See generally* Elizabeth F. Loftus, *Eyewitness Testimony* (1979). Petitioner is identified as the shooter only by the "excited utterances" made by the victim, who died shortly after he made his statement. That other circumstances of the case tend to bolster the reliability of this identification does not erase concern.

This is, of course, not the only troubling case. Even assuming, conservatively, an erroneous conviction rate of one-quarter of one percent, there are thousands of factually innocent individuals in state jails today. *See* Bureau of Justice Statistics, United States Dep't of Justice, *at* http://www.ojp.usdoj.gov/bjs/correct.htm (1,277,127 inmates under State jurisdiction at the end of 2002); *cf.* John T. Rago, *"Truth or Consequences" and Post–Conviction DNA Testing: Have You Reached Your Verdict?*, 107 Dickinson L.Rev. 805, 870–71 (2003). Regardless of the precise rate of error, an appreciable number of inmates in state and federal jails did not commit the crime or crimes of which they are convicted. *See generally* Edwin M. Borchard, *Convicting the Innocent* (1932); Keith A. Findley, *Learning From Our Mistakes: A Criminal Justice Commission to Study Wrongful Convictions*, 38 Cal. W.L.Rev. 333 (2002).; James S. Liebman, *The Overproduction of Death*, 100 Colum. L.Rev.2030 (2000). Because it is hard if not impossible to positively determine "innocence," the problem is the difficulty of identifying which inmates are truly not guilty.

Alternatives possibly do remain available to petitioner in state court. He has not filed any state collateral motions attacking his proceedings. Further research and investigation may uncover factual or legal issues with respect to petitioner's trial not yet brought to light. A collateral attack on petitioner's conviction in state court may be successful. As of now there is no indication that it will be.

## VII. Conclusion

The petition for a writ of habeas corpus is denied.

A certificate of appealability is granted with respect to petitioner's claim that admission of the victim's statements identifying him as the shooter denied him his constitutional right to a fundamentally fair trial.

SO ORDERED.