Marcus MUNGO, Petitioner–Appellant,

v.

George DUNCAN, Respondent–Appellee.

No. 03–2706.

United States Court of Appeals, Second Circuit.

Argued: May 12, 2004.

Decided: Dec. 28, 2004.

---

Randall D. Unger, Bayside, NY, for Petitioner–Appellant.

Amy Appelbaum, Assistant District Attorney (Charles J. Hynes, District Attorney, Leonard Joblove, Assistant District Attorney, on the brief), Kings County Office of the District Attorney, Brooklyn, NY, for Respondent–Appellee.

Before: MESKILL, LEVAL, and CABRANES, Circuit Judges.

LEVAL, Circuit Judge.

Petitioner Marcus Mungo appeals from the judgment of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *J.*) denying his petition for a writ of habeas corpus, which sought to overturn his conviction in the courts of New York for murder. Petitioner contends that the admission at his trial of certain hearsay statements made by the murder victim just before his death violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. Upon petitioner's direct appeal from his conviction, the New York Supreme Court, Appellate Division, determined that the admission of the hearsay statements was proper under the excited utterance exception to the hearsay rule. In judging the habeas petition, the district court concluded that this ruling was not an unreasonable application of clearly established Supreme Court law, including *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). The district court accordingly ruled that the state court's decision satisfied the deferential standards of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1), and denied the petition. While this appeal from the district court's judgment was pending, the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), in a manner that reconceived much of the Court's Confrontation Clause jurisprudence. Petitioner contends that under the standards established in *Crawford* he is entitled to grant of the writ. We agree with the district court that the state court did not unreasonably apply *Roberts* and *White*, and we further hold that petitioner is barred by *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), from relying on the new rule established in *Crawford.*

### Background

At approximately 1:20 a.m. on the morning of June 23, 1997, on Euclid Avenue in Brooklyn, New York, two plainclothes police officers, driving a police cruiser disguised as a taxicab, heard shots fired. Driving toward the sound of the shots, they were flagged down by the wounded Brent Arthur. They saw two black men in light-colored shirts run across the street. The driver, Sergeant Robert Delaney, asked Arthur, "Who shot you? Those guys running?" Arthur answered, "Yeah those guys." With Arthur in the cruiser, they drove off in pursuit. The second

officer, Dante Cavallo, asked Arthur, "Do you know where they are going?" Arthur responded, "Go to the projects, go to the projects," referring to a nearby housing project at 1220 Sutter Avenue. When they arrived at Sutter Avenue, the officers saw two black men in the driveway. One wore a gray t-shirt; the other a white t-shirt with multicolored lettering. Delaney asked Arthur if the two men were his assailants. Arthur answered, "Those are them."

Cavallo, joined by other officers, pursued the men into 1220 Sutter Avenue and found them hiding in the doorway of a fourth-floor apartment. The men were later identified as petitioner Marcus Mungo (in the gray shirt) and LeShawn Stewart (in the white shirt). No weapons were found on either man. By the time the men were brought downstairs, Arthur was lying on the ground near the cruiser writhing in pain. Sergeant Delaney told him that an ambulance was on the way and said, "Listen, I'm going to bring over two people, bring two people over to you one at a time. You have to tell me are these the guys that shot you." Officer Cavallo then brought forward Stewart and asked, "Is that the guy that shot you?" Arthur answered, "Yes." Cavallo then brought forward petitioner and asked, "Is this the guy that shot you?" Arthur again answered, "Yes." Cavallo then asked Arthur, "I need to know exactly who shot you." Arthur responded, "The guy in the gray." Delaney asked Arthur why they had shot him, and Arthur stated, "They tried to rob me." Arthur died shortly thereafter. In Officer Cavallo's estimation, the entire episode from the time when Arthur entered the cruiser until he identified the defendant lasted only about two and one-half to three minutes.

In statements to police the next day, petitioner admitted that until the previous evening he had lived on Euclid Avenue in an apartment owned by Arthur. Petitioner stated that he had decided to move out of the apartment the previous night and move into Stewart's apartment at 1220 Sutter Avenue. Petitioner denied hearing any gunshots, but stated that while he and Stewart were standing on the street, Stewart had suddenly begun to run. Petitioner then ran with him back to Stewart's apartment, whereupon they were arrested.

Over objection, the trial judge admitted into evidence under the excited utterance exception to the hearsay rule Arthur's several statements tending to identify petitioner as the shooter. The jury convicted petitioner of second degree murder, and he was sentenced to a term of twenty-five years to life. The Appellate Division affirmed, rejecting petitioner's contentions relating to his hearsay objection. *People v. Mungo*, 287 A.D.2d 523, 731 N.Y.S.2d 632, 632–33 (App. Div.2d Dep't 2001). Leave to appeal to the Court of Appeals was denied. *People v. Mungo*, 97 N.Y.2d 685, 738 N.Y.S.2d 301, 764 N.E.2d 405 (2001); *People v. Mungo*, 98 N.Y.2d 639, 744 N.Y.S.2d 768, 771 N.E.2d 841 (2002).

Mungo petitioned for a writ of habeas corpus under 28 U.S.C. § 2254, arguing that the admission of Arthur's statements at trial violated his rights under the Confrontation Clause. The district court applied AEDPA's deferential standard of review and denied the petition, finding that the state court's ruling was not an unreasonable application of Supreme Court precedent. The court reasoned that the statements were properly admitted under the excited utterance exception to the hearsay rule, and thus, under *White*, were categorically immune from Confrontation Clause challenge. *Mungo v. Duncan*, 277 F.Supp.2d 176, 184 (E.D.N.Y.2003). The court, however, granted a certificate of appealability, noting the "fallacy of the assumption that out of court 'excited utter-

ances,' as a class, should be presumed reliable without further examination of the trustworthiness of the statements." *Id.* at 185.

### Discussion

1. *Analysis of the petition under* Roberts *and* White. The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." In *Ohio v. Roberts*, the Court stated that the Confrontation Clause "was intended to exclude some hearsay," 448 U.S. at 63, 100 S.Ct. 2531, but that it nonetheless countenances "hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule,'" *id.* at 65, 100 S.Ct. 2531 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). Reliability, the Court said, could either be established through "a showing of particularized guarantees of trustworthiness," or be inferred from the fact that the evidence fell "within a firmly rooted hearsay exception." *Id.* at 66, 100 S.Ct. 2531. Subsequently, in *White v. Illinois*, the Court recognized that "spontaneous declarations"—which describes the same category of statements as the term "excited utterances" used in the courts of New York—fell within a "firmly rooted" hearsay exception. *See* 502 U.S. at 355 n. 8, 112 S.Ct. 736. The Court therefore ruled constitutionally admissible statements by a four-year-old girl made about an hour after her sexual assault, even though the girl was available and could have been required to testify. *Id.* at 356–57, 112 S.Ct. 736. *See also Brown v. Keane*, 355 F.3d 82, 89–90 (2d Cir.2004) (noting that the excited utterance exception "has been ruled to be firmly rooted")

(citing *Lilly v. Virginia*, 527 U.S. 116, 126, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)).

Petitioner essentially concedes that the statements challenged here fall within New York's excited utterance exception to the hearsay rule. *See* Pet. Reply Br. at 2 ("[T]he appellant has essentially conceded that the statements elicited from Arthur by the police were excited utterances, as the courts in New York have consistently interpreted this exception."). Under New York's rule, "[a]n excited utterance occurs under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection"—a period which "is not measured in minutes or seconds but rather is measured by facts." *People v. Cotto*, 92 N.Y.2d 68, 78–79, 677 N.Y.S.2d 35, 699 N.E.2d 394 (1998) (internal quotation marks omitted).

Petitioner instead contends that the statements admitted here were so inherently unreliable that, despite falling within New York's excited utterance exception, they should not be considered to bear the "indicia of reliability" generally required by *Roberts*. *See* 448 U.S. at 66, 100 S.Ct. 2531. We cannot say that it would have been unreasonable for the Appellate Division to reject this argument. Even accepting that some statements that fall within New York's excited utterance exception might be too unreliable to support the inference of reliability drawn by *White* for all statements within the traditional common law spontaneous declaration exception, the statements admitted here were not clearly of such a nature. In *White*, the Court described the exception by stating that "[a] statement that has been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation—may justifiably carry more weight with a trier

of fact than a similar statement offered in the relative calm of the courtroom." *White*, 502 U.S. at 356, 112 S.Ct. 736. The Court referred with apparent approval to the Federal Rule of Evidence incorporating the exception. *Id.* at 355 n. 8, 112 S.Ct. 736; *see also* Fed.R.Evid. 803(2) (describing an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). The district court here assumed that the statement would have qualified under the Federal Rule, *Mungo*, 277 F.Supp.2d at 184, and petitioner does not suggest otherwise.

Petitioner argues only that (i) the statements were prompted by police questions, some of which were leading; and (ii) Arthur identified both Stewart and petitioner as the shooter, and only specified petitioner when the police said they needed to know which of the two pulled the trigger.[1] On the other hand, as the People point out, Arthur knew petitioner personally, and was thus unlikely to confuse him with someone else. Furthermore, if Arthur was attacked by both men acting in concert, as appears to have been the case, it was reasonable for him to describe both as having shot him, even though only one held the gun and pulled the trigger. We do not see these factors as inconsistencies casting serious doubt on the reliability of the statements. We cannot say that the Appellate Division's ruling amounted to an objectively unreasonable application of then-current Confrontation Clause jurisprudence. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, *J.*, for the Court).

■ **2.** *Retroactive Application of Crawford.* On March 8, 2004, after the district court had denied the petition for habeas corpus, and while this appeal was pending, the Supreme Court issued its opinion in *Crawford.* The opinion reconceived much of the Court's prior Confrontation Clause jurisprudence in a manner that is potentially inconsistent with the court's admission of some of Arthur's statements at trial. *Crawford* ruled essentially that, notwithstanding the prior holdings of *Roberts* and *White*, out-of-court statements of a person who does not appear as a witness at trial that are of a "testimonial" nature[2] may not be received against the accused to establish the truth of what was stated unless (i) the declarant is unavailable to testify at the trial, and (ii) the accused was afforded a prior opportunity to cross-examine the declarant on the statement. *Crawford*, 124 S.Ct. at 1365–66 ("As the English authorities above reveal, the common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations."). The People argue that petitioner is barred from retroactively invok-

---

1. Petitioner suggests further that the identification was suspect because it was dark, but there was testimony that the area was lit by floodlights. Finally, petitioner suggests that the identification was suspect because Arthur was in need of medical attention and was just trying to "placate" the police officers. At the time of the identification, however, the officers had already told Arthur that an ambulance was on the way.

2. The Supreme Court expressly refrained from defining "testimonial." *See Crawford*, 124 S.Ct. at 1374 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' "). The Court's brief discussion suggested, however, that the term was intended to include sworn evidentiary statements, such as affidavits, depositions, grand jury testimony, and trial testimony, as well as unsworn declarations given to the police.

ing *Crawford* both by the nonretroactivity doctrine of *Teague v. Lane,* and by the independent nonretroactivity rule imposed by AEDPA in § 2254(d)(1). Petitioner contends that *Crawford* establishes a "watershed" rule of criminal procedure, and that neither *Teague* nor AEDPA bars retroactive application of such a watershed rule.

■ a. *Nonretroactivity Under* Teague v. Lane *and AEDPA.* In *Teague,* the Supreme Court barred the application of new procedural rulings in the collateral review of convictions that became final before those rulings were announced. *See Teague,* 489 U.S. at 310, 109 S.Ct. 1060 (plurality opinion); *Penry v. Lynaugh,* 492 U.S. 302, 313, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (majority opinion adopting the *Teague* analysis).[3]

■ The *Teague* opinion, however, delineated two exceptions. The first, which is not pertinent to this controversy, is that "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Teague,* 489 U.S. at 311, 109 S.Ct. 1060 (quoting *Mackey v. United States,* 401 U.S. 667, 692, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, *J.,* concurring in part and dissenting in part)).[4] The second exception is for "new 'watershed rules of criminal procedure' that are necessary to the fundamental fairness of the criminal proceeding" and improve the accuracy of

the criminal process. *Gaines v. Kelly,* 202 F.3d 598, 604 (2d Cir.2000) (quoting *Sawyer v. Smith,* 497 U.S. 227, 241–42, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (*quoting Teague,* 489 U.S. at 311, 109 S.Ct. 1060)). Petitioner contends that the new rule of *Crawford* is a "watershed" rule which falls within this exception.

■ A second principle of nonretroactivity with potential application to this case was created by AEDPA itself. Under the AEDPA provision codified at 28 U.S.C. § 2254(d)(1), if a state prisoner seeks habeas corpus relief on a claim that was decided on the merits by the state court, we apply the following standard:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim … resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. …

28 U.S.C. § 2254(d)(1). The Supreme Court has described this standard as mandating that federal courts decide habeas corpus petitions not with reference to the Supreme Court's current jurisprudence, but rather with reference to the Supreme Court jurisprudence as of either the date of the pertinent state court "adjudicat[ion]

---

**3.** A conviction becomes final for the purposes of *Teague* when "the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally decided." *Beard v. Banks,* —— U.S. ——, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004) (quoting *Caspari v. Bohlen,* 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (internal quotation marks omitted)).

**4.** The Court has recently clarified that because *Teague* by its own terms applies only to new procedural rules, the first so-called exception is not so much an exception as a category of substantive rules not subject to *Teague*'s bar. *See Schriro v. Summerlin,* —— U.S. ——, 124 S.Ct. 2519, 2523 n. 4, 159 L.Ed.2d 442 (2004).

on the merits," or the date when the state court conviction became final.[5] *See Williams*, 529 U.S. at 412, 120 S.Ct. 1495 (O'Connor, *J.*, for the Court) (stating that the "clearly established" phrase in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision"); *id.* at 380, 120 S.Ct. 1495 (Stevens, *J.*, for four justices) ("AEDPA codifies *Teague* to the extent that *Teague* requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final."); *cf. id.* at 390, 120 S.Ct. 1495 (Stevens, *J.*, for the Court) ("The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final.").[6] We have also held in general terms that § 2254(d)(1) bars retroactive reliance on new rules of law. *See Vasquez v. Strack*, 228 F.3d 143, 148 (2d Cir.2000) ("If petitioner's claim requires us to apply a rule of law that was not clearly established Federal law as determined by the Supreme Court at the time of the state court determination, Section 2254(d)(1) bars relief.").

Because the state court adjudicated petitioner's claim on the merits, § 2254(d)(1) applies. The People point out that § 2254(d)(1), unlike the *Teague* opinion, does not set forth an exception for watershed rules. They argue that, even if *Crawford* is deemed retroactive under the

*Teague* exception, the new *Crawford* rule cannot be applied under AEDPA and the petition must be denied. The question thus arises whether § 2254(d)(1) nullifies *Teague*'s exceptions in cases coming within the statute's terms, or instead implicitly adopts them.

This poses a difficult question of statutory, and perhaps even constitutional, interpretation. *Teague*'s exception to the general rule of nonretroactivity gives recognition to new rulings that purport to enhance the accuracy of the factfinding process in a manner "necessary to the fundamental fairness of the criminal proceeding." *Gaines*, 202 F.3d at 604 (internal quotation marks omitted). The People argue that no such exception exists under the AEDPA rule. According to this argument, if a state criminal conviction were obtained in a manner later determined by the Supreme Court to be not only unconstitutional but also incompatible with fundamental fairness and fraught with an "impermissibly large risk that the innocent will be convicted," *Teague*, 489 U.S. at 312–13, 109 S.Ct. 1060 (internal quotation marks omitted), the federal courts would nonetheless be compelled to reject the petition and accept the potentially inaccurate and fundamentally unfair conviction, so long as the state court had affirmed on the merits.

In any case, whether § 2254(d)(1) was intended, or out of prudence should be read, to adopt the *Teague* exceptions is a

---

**5.** Because *Crawford* was decided long after both the relevant adjudication on the merits and the date when petitioner's conviction became final, the precise date on which § 2254(d)(1)'s nonretroactivity rule takes hold is not material for our purposes.

**6.** The *Williams* case did not turn on nonretroactivity. The petitioner, Terry Williams, argued that his death sentence was invalid because his counsel had been ineffective in

failing to present mitigation evidence. A majority of the justices agreed that, under the test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Williams had in fact been denied his Sixth Amendment right to counsel. *Williams*, 529 U.S. at 398–99, 120 S.Ct. 1495. Williams's conviction had become final in 1988, four years after *Strickland*. *See id.* at 370, 120 S.Ct. 1495.

question we need not answer because we conclude that the *Crawford* rule does not qualify as a watershed rule coming within the exception to *Teague.* We therefore find that petitioner's reliance on *Crawford* is barred by *Teague* itself, and an interpretation of the scope of § 2254(d)(1)'s anti-retroactive effect is unnecessary to the disposition of this case.

 b. *Analysis Under* Teague. *Teague* bars petitioner from relying on a new rule of criminal procedure, unless that rule fits into the exception for watershed rules. We assume for analysis of the question that *Crawford* announced a new rule of criminal procedure. As noted above, the Supreme Court in *Roberts* stated that the Confrontation Clause countenances "hearsay marked with such trustworthiness that there is no material departure from the reason of the general rule," 448 U.S. at 65, 100 S.Ct. 2531 (internal quotation marks omitted), and that the requisite trustworthiness could be inferred if the evidence fell within a "firmly rooted" hearsay exception, *id.* at 66, 100 S.Ct. 2531. In *Crawford*, however, the Court divided out-of-court statements into two categories, those that are testimonial in nature and those that are not, asserting that testimonial hearsay is the "primary," if not the only, object of the Confrontation Clause. *See* 124 S.Ct. at 1364–65, 1370. It then held that the testimonial statement of a person who does not appear as a witness at the trial may not be admitted against the accused to prove the truth of the statement unless the declarant is unavailable to appear as a witness and the accused had a prior opportunity for cross-examination. *See id.* at 1365–66, 1369.

Assuming that *Crawford* announced a new rule, the question of its retroactivity turns, for our purposes, on whether the rule is necessary to the fundamental fairness, and improves the accuracy, of criminal proceedings. *Teague*, 489 U.S. at 311–14, 109 S.Ct. 1060. We do not believe that *Crawford* necessarily improves the overall accuracy of the criminal process. As we see the operation of the *Crawford* rule, it is likely to improve accuracy in some circumstances and diminish it in others. To the extent that *Crawford* requires the exclusion of unreliable hearsay that would have been admitted under the prior law, it is likely to improve accuracy. As the *Crawford* Court noted, courts applying *Roberts* were required to make "amorphous" determinations whether hearsay statements bore "particularized guarantees of trustworthiness," and inevitably received unreliable evidence on that basis on some occasions. *Crawford*, 124 S.Ct. at 1370–72. Further, as Judge Weinstein observed below, not all hearsay statements that fit within firmly established exceptions to the hearsay rule are necessarily reliable. *Mungo*, 277 F.Supp.2d at 184–85. Because *Crawford* bars the admission of testimonial statements that would have been countenanced by the old rules, and because some such evidence is unreliable, *Crawford* will in those instances improve the accuracy of the process.

At the same time, however, *Crawford* also precludes admission of highly reliable testimonial out-of-court statements that would have been admissible under the old rules. In such instances, juries will be deprived of highly reliable evidence of guilt, and cases that otherwise would have resulted in well-deserved convictions will now result in acquittals or hung juries. We recognize that *Crawford*'s rule derives from the principle that cross-examination is a better engine of truth-determination than a judge's assessment of the reliability of uncross-examined hearsay. *Crawford*, 124 S.Ct. at 1370. We do not question this principle. But it does not necessarily fol-

low that the *Crawford* rule will improve the accuracy of the process. For the requirement of cross-examination will, in cases where the declarant is not available to be called for cross-examination, simply result in the exclusion of the testimony altogether. Where the testimony was admissible under the old rules precisely because it was reliable, these applications of *Crawford* will diminish, rather than increase, the accuracy of the process.[7]

■ In short, the advent of the *Crawford* rule brings about substantial changes in the protection given by the Confrontation Clause to an accused from receipt of uncross-examined statements. In some instances those changes will likely improve the accuracy of the factfinding process; in others they will likely impair the accuracy of the factfinding process. Because *Teague*'s test of a watershed rule requires improvement in the accuracy of the trial process overall, we conclude that *Crawford* is not a watershed rule. We thus conclude that *Crawford* should not be applied retroactively on collateral review.[8] Accordingly, our conclusion that the Appellate Division did not unreasonably apply the then-current law of *Roberts* and *White* is sufficient to dispose of the petition.[9]

7. *Crawford* did not rule on whether the Confrontation Clause has any application to non-testimonial hearsay. *See Crawford*, 124 S.Ct. at 1369–70. But the opinion asserted that testimonial hearsay is the "primary object" of the Confrontation Clause, *id.* at 1365; it might conceivably be later construed to mean that nontestimonial hearsay is not within the Confrontation Clause's concern at all. If the *Crawford* rule is eventually so interpreted, it will additionally diminish the accuracy of the trial process: under *Roberts*, nontestimonial hearsay deemed unreliable is barred by the Confrontation Clause.

8. In so holding, we join the only other court of appeals to rule on the issue thus far. *See Brown v. Uphoff*, 381 F.3d 1219, 1226–27 (10th Cir.2004).

9. Because petitioner is barred by *Teague* from relying on *Crawford*, we need not address whether the hearsay statements admitted in this case were testimonial and thus excluded within the meaning of *Crawford*. Nonetheless, in an effort to begin to understand the boundaries of the "testimonial" concept, we offer in dictum some speculation as to how the distinction drawn by *Crawford* might apply to Arthur's several statements to the police.

As noted above, the Supreme Court refrained from attempting to specify the boundaries of "testimonial" statements. After reference to trial testimony, affidavits, depositions, and vague references to "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *Crawford*, 124 S.Ct. at 1364, the Court went on to say that "[s]tatements taken by police officers in the course of interrogations are also testimonial ...." *Id.* Although the word "interrogation" can include any asking of questions, the first meaning listed (for "interrogate") in *Webster's Third New International Dictionary* is "to question typically with formality, command, and thoroughness for full information and circumstantial detail." *Webster's Third New International Dictionary* 1182 (1976). We believe the Supreme Court intended this more limited meaning, which is more consistent with the other types of testimonial statements the Court mentioned.

Several statements made by Arthur to the police were admitted at Mungo's trial. The first group were the responses to a series of investigatory and hot-pursuit questions, including whether "[t]hose guys running" were the ones who shot Arthur, whether Arthur knew where they were going, and, upon overtaking them, whether they were the shooters. Again after Mungo and Stewart had been taken into custody, the police asked Arthur as to each whether this was the person who had shot him. When Arthur answered yes as to each of the two, Officer Cavallo pressed for clarification, "I need to know exactly who shot you," to which Arthur responded, "The guy in gray [Mungo]," and explained, "They tried to rob me."

As for the answers to the early questions, delivered in emergency circumstances to help the police nab Arthur's assailants, we doubt that these were of the type of declarations the Court would regard as testimonial. As for the

## Conclusion

The judgment of the district court is AFFIRMED.

final statement, however, made after Mungo and Stewart had been caught, and after Arthur had confirmed that they were the men who shot him, specifically that it was Mungo who shot the gun and that the motive was robbery, this statement seems to have been made in greater formality with a view to creating a record and proving charges. It seems more likely to fall within the category the Court described as testimonial.

The Supreme Court declined to attempt any precise definition of "testimonial," wisely sensing that the issue was complex and that the exact rule should gradually emerge in light of cumulative experience. We offer these reflections in the hope that they may assist courts to work gradually, case by case, toward a functional understanding of the term.