*763 OPINION OF THE COURT
Michael A. Correero, J.
Defendant Christopher Vasquez was convicted as a juvenile offender on January 25, 1999, following a jury trial, of the crime of manslaughter in the first degree in violation of Penal Law § 125.20 (1). He was sentenced to an indeterminate term of imprisonment of 3Vs to 10 years, the maximum sentence for that crime pursuant to the Juvenile Offender Law (Penal Law § 70.05). The defendant’s conviction was affirmed by the First Department on October 17, 2002. (People v Vasquez, 298 AD2d 230 [1st Dept 2002].) Leave to appeal was denied by the Court of Appeals on May 13, 2003. (People v Vasquez, 100 NY2d 543 [2003].)
On appeal to the Appellate Division, the defendant claimed that this court’s ruling which permitted the People to introduce, on their direct case against defendant Vasquez, portions of the guilty plea allocution of codefendant Daphne Abdela as a declaration against penal interest contravened defendant Vasquez’s right of confrontation. The defendant argued that Abdela’s plea allocution was neither against her penal interest nor reliable. This argument was rejected on direct appeal by the First Department. The Court noted that “all the constitutional requirements for admission of such a declaration were satisfied.” (Vasquez, 298 AD2d at 230-231.)
The defendant’s direct appeal became final upon the Court of Appeals’ denial of leave to appeal. Nevertheless, the defendant now seeks to vacate his judgment of conviction pursuant to CPL 440.10 (1) (h) and (2) (a) on the ground that he was denied the right to confront the witnesses against him, in violation of both the New York State and Federal Constitutions. (US Const Amends VI, XIV; NY Const, art I, § 6.)
Specifically, the defendant argues that the introduction of co-defendant Daphne Abdela’s plea allocution on the People’s direct case runs afoul of the recent United States Supreme Court decision in Crawford v Washington (541 US 36 [2004]). In an opinion, authored by Justice Antonin Scalia, the Supreme Court in Crawford rejected the previous test for admissibility of such evidence set forth in Ohio v Roberts (448 US 56 [1980]), upon which this court had relied in permitting introduction of the allocution. Crawford ruled essentially that, notwithstanding the prior holding of Roberts, out-of-court statements of a person who does not appear as a witness, that are of a “testimonial” nature, may not be received against the accused to establish the *764 truth of what was stated unless: (i) the declarant is unavailable to testify at the trial, and (ii) the accused was afforded a prior opportunity to cross-examine the declarant on the statement. (See Mungo v Duncan, 393 F3d 327 [2d Cir 2004].) Since the Crawford court invalidated the Roberts procedure for determining the admissibility of certain testimonial statements, the instant motion thus raises the issue whether the Crawford rule should be applied retroactively on a postconviction motion, collaterally attacking a judgment which has become final on direct review.
The question of the retroactive application of Crawford in this context requires careful analysis of the Supreme Court doctrine of retroactivity as it relates to collateral review. Before examining the issue of retroactivity, however, it is important to note the steps taken at the trial level to meet the constitutional requirements set forth in Roberts, the prevailing authority at the time, to permit the admission of Abdela’s plea allocution. The factual and legal context of the admission of the plea allocution were fully set forth in this court’s decision in People v Vasquez (179 Misc 2d 854 [1999]). However, for contextual purposes, I quote the pertinent portions of my decision that relate to the procedural apparatus followed by the court in permitting admission of the statement, since it will have a bearing, ultimately, on application of the appropriate standard in determining whether the Crawford rule is to be applied retroactively.
The Legal Framework Applied in Vasquez
During the course of the Vasquez trial, the court admitted into evidence portions of codefendant Daphne Abdela’s plea allocution in which she described acts of the defendant Vasquez which occurred simultaneously with her own, which were necessary to establish the mens rea essential to the validity of her plea to manslaughter in the first degree. In particular, defendant Abdela stated that codefendant Vasquez was wielding a knife against the victim when she acted in concert with him. Prior to the admission of this evidence, the court engaged in the then constitutionally prescribed evaluation of the proffered evidence pursuant to the Supreme Court standards as set forth in Roberts. Specifically, the court noted, “[T]he crucial inquiry focuses on the intrinsic trustworthiness of the statement as confirmed by competent evidence independent of the declaration itself.” (Vasquez, 179 Misc 2d at 864, quoting People v *765 Settles, 46 NY2d 154, 169 [1978] [internal quotation marks omitted].)
Since 1980, the controlling precedent for determining the admissibility of certain forms of hearsay within the context of the Sixth Amendment protection was the test set forth in Ohio v Roberts (448 US 56 [1980]), and its progeny. Pursuant to Roberts, the admissibility of a hearsay statement made by an out-of-court declarant was premised upon that statement’s indicia of reliability. Such a statement would be considered reliable for the purpose of consideration by the factfinder if it fell within a “firmly rooted hearsay exception” or was supported by “particularized guarantees of trustworthiness.” (Roberts, 448 US at 66.) In making my determination as to the admissibility of the proffered plea allocution, this court stated:
“The Sixth Amendment of the United States Constitution provides in part: ‘In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him’.
“Confrontation implies the right to see, to hear and, in order to effectively confront the witness, to cross-examine.
“The rule against hearsay recognizes the fundamental importance of cross-examination as a valuable tool to test the reliability of information presented at trial. The relationship between the Confrontation Clause and the hearsay rule was discussed by the Supreme Court in Ohio v Roberts (448 US 56, 66): ‘In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate “indicia of reliability.” Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness. ’
“The Confrontation Clause of the Sixth Amendment has consistently been construed to permit use of declarations of individuals who have not been subject to cross-examination, provided stringent standards assure the degree of reliability and probative value necessary to substitute for a defendant’s loss of the opportunity to cross-examine the declar *766 ant. (See, Chambers v Mississippi, 410 US 284; Ohio v Roberts, 448 US 56, supra.)
“An exception to the hearsay rule, the declaration against penal interest is founded on the commonsense assumption that one will not ‘ordinarily make a statement which jeopardizes his interest by subjecting himself or herself to criminal prosecution and incarceration.’ (People v Settles, 46 NY2d 154, 168.) Therefore, absent other motivations, when an individual makes a declaration against penal interest, ‘he is responding to a truth-revealing compulsion as great as that to which he would likely be subjected if cross-examined as a witness.’ (People v Maerling, 46 NY2d 289, 295; People v Thomas, supra, at 200-201.) Stated otherwise, the stringent standards applied for determining whether a statement qualifies as a declaration against penal interest operate also to assure the degree of reliability and probative value necessary to substitute for a defendant’s loss of the opportunity to cross-examine the declarant. (People v Thomas, supra, at 201; see also, People v Guidice, 192 AD2d 383 [1st Dept 1993].)
“The Court of Appeals, as aforesaid in Thomas (supra), held that statements contained in a plea allocution of a codefendant may, in limited circumstances, be received in evidence as a declaration against penal interest. . .
“ ‘Hearsay evidence is admissible as a declaration against penal interest only if four prerequisites are met: (1) the declarant must be unavailable to give testimony, whether by reason of absence from the jurisdiction, refusal to testify on constitutional grounds or death; (2) the declarant must have been aware at the time of its making that the statement was contrary to his penal interest; (3) the declarant must have competent knowledge of the underlying facts; and (4) there must be sufficient competent evidence independent of the declaration to assure its trustworthiness and reliability.’ (People v Thomas, supra, at 197.)” (Vasquez, 179 Misc 2d at 860-862.)
Applying the then controlling framework, this court evaluated the evidence adduced by the People up until that point in the trial. A searching inquiry was conducted into the “intrinsic truthfulness” of Abdela’s statement and, as required by Roberts, *767 a judicial assessment of the statement was made to determine whether the statement fell within a firmly rooted hearsay exception or whether there was sufficient evidence to find that it was supported by “particularized guarantees of trustworthiness.” The court found sufficient evidence for both of those conclusions noting:
“At that point in the trial when the prosecution sought to introduce the plea allocution on their direct case, several independent pieces of evidence had already been placed before the jury, which directly corroborated the facts as allocated to by Abdela. The following supportive evidence was adduced on the prosecution’s direct case:
“1. Abdela and Vasquez were the last people to be seen with Mr. McMorrow prior to his death and they were walking with him at approximately 11:00 p.m. in the direction of the lake where the crime took place;
“2. Within 15 minutes after a police officer in Central Park heard two screams of a male voice in the vicinity of the lake where the deceased’s body was ultimately found, the officer observed the defendants roller-blading away from the general direction of the deceased’s body;
“3. The defendants were observed together in a bathroom in the lobby of Abdela’s apartment building washing blood off of each other;
“4. Defendant Vasquez’s blood was found in significant quantities at the crime scene, whereas none of Abdela’s blood was found at the crime scene, nor on any clothing that was recovered;
“5. At the time of arrest, defendant Vasquez was observed to have many injuries . . . supporting Abdela’s statement that the deceased and Vasquez were engaged in a struggle. Defendant Vasquez also had a knife wound to his left index finger which the People’s Medical Examiner testified was consistent with defendant Vasquez having cut himself during the attack;
“6. A folding knife was found in defendant Vasquez’s bedroom. The knife contained DNA which was consistent with a mixture of defendant Vasquez’s blood and the deceased’s blood, but which could not have come from Abdela. This forensic evidence cor *768 roborated Abdela’s statement in the allocution that defendant Vasquez was using the knife;
“7. Corroborative of Abdela’s statement that she kicked the deceased causing him to fall backward were the autopsy report and photographs of the deceased. The People’s Medical Examiner testified that three distinct contusions to the deceased’s right thigh were consistent with a kick from Abdela’s roller blades, and thus independently supported Abdela’s statement in the allocution that she kicked the deceased’s legs out from under him;
“8. The deceased died from multiple stab and incise wounds, and according to the People’s Medical Examiner, the wounds were consistent with the knife found in defendant Vasquez’s apartment.” (Vasquez, 179 Misc 2d at 864-865.)
Therefore I found:
“Reference to Vasquez’s conduct, as opposed to his identity . . . was relevant in establishing the extent of Abdela’s criminal liability, and did fall within the hearsay exception ...
“In sum, Abdela’s description of Vasquez’s acts, which occurred simultaneously with her own, was inextricably intertwined with the description of her own acts, in that the combined actions demonstrate Abdela’s mens rea as set forth in the allocution to first degree manslaughter. Moreover, reference to those same acts establishes the manner in which the death was caused; that is, Abdela was acting in concert with another in the commission of the crime. Therefore, since Abdela’s description of Vasquez’s actions was not superfluous to her manslaughter plea, but was, in fact, essential to its validity, and since such description established elements of the homicide charges, I found the entire factual portion of the allocution fell within this hearsay exception and was admissible.” (179 Misc 2d at 865-867.)
“During the trial, the circumstances surrounding the taking of the plea allocution, as well as the chronology of preceding meetings between Abdela and law enforcement officials, were explored by defense counsel. A limiting instruction was given to the jury, both at the time that the evidence was admitted on the People’s direct case, as well as during the court’s final charge, regarding the purpose *769 for which the jury was to consider this evidence, as well as the manner in which they were to assess its trustworthiness and reliability.” (Vasquez, 179 Misc 2d at 867 n 6.)
I then ruled that:
“The admission of Abdela’s plea allocution statement, as an exception to the hearsay rule, did not violate the defendant’s right to confrontation, since the prosecution established sufficient independent evidence of its reliability. The jury, however, as the trier of fact, had the ultimate responsibility of determining the weight to be given the statement. (See, People v Settles, 46 NY2d 154, 170, supra.)” (Vasquez, 179 Misc 2d at 867.)
In the instant motion, the defendant argues that the above procedure is not permissible under Crawford and further contends that Crawford must be retroactively applied on collateral review.
The Supreme Court’s Doctrine of Retroactivity
The law of retroactivity has had a complex evolution. Justice John Harlan, the driving force behind its modern understanding, once described it as “almost as difficult to follow as the tracks made by a beast of prey in search of its intended victim.” (Mackey v United States, 401 US 667, 676 [1971].) Its most recent formulation can be found in the Supreme Court case of Schriro v Summerlin (542 US 348, 124 S Ct 2519 [2004]). Justice Scalia, the author of both Schriro and Crawford, writing for the Schriro majority, described it as follows:
“When a decision of this Court results in a ‘new rule,’ that rule applies to all criminal cases still pending on direct review. Griffith v. Kentucky, 479 U.S. 314, 328 (1987). As to convictions that are already final, however, the rule applies only in limited circumstances. New substantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, see Bousley v. United States, 523 U.S. 614, 620-621 (1998), as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State’s power to punish, see Saffle v. Parks, 494 U.S. 484, 494-495 (1990); *770 Teague v. Lane, 489 U.S. 288, 311 (1989) (plurality opinion). Such rules apply retroactively because they ‘necessarily carry a significant risk that a defendant stands convicted of “an act that the law does not make criminal” ’ or faces a punishment that the law cannot impose upon him. Bousley, supra, at 620 (quoting Davis v. United States, 417 U.S. 333, 346 (1974)).
“New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of ‘ “watershed rules of criminal procedure” implicating the fundamental fairness and accuracy of the criminal proceeding.’ Saffle, supra, at 495 (quoting Teague, 489 U.S., at 311). That a new procedural rule is ‘fundamental’ in some abstract sense is not enough; the rule must be one ‘without which the likelihood of an accurate conviction is seriously diminished.’ Id., at 313 (emphasis added). This class of rules is extremely narrow, and ‘it is unlikely that any . . . “ha[s] yet to emerge.” ’ Tyler v. Cain, 533 U.S. 656, 667, n. 7 (2001) (quoting Sawyer v. Smith, 497 U.S. 227, 243 (1990)).” (Schriro, 542 US at —, 124 S Ct at 2522-2523.)
Justice Scalia’s statement of the rules of retroactivity are pivotal to the proper analysis of the issue presented by the instant motion. A review of the Supreme Court decisions that developed the law of retroactivity, from the seminal case of Linkletter v Walker (381 US 618 [1965]), to the formulation of the rules of retroactivity found in Teague v Lane (489 US 288 [1989]) and as stated in Schriro, reveals a progressive and deliberate refinement of the initial balancing test described in Linkletter-, culminating in a narrowing of the sphere of constitutional rules which require retroactive application. In particular, it is imperative to recognize the Court’s emphasis on the requirement that the new procedural rule in order to be retroactively applied must be one “without which the likelihood of an accurate *771 conviction is seriously diminished.” (Teague, 489 US at 313 [emphasis added]; Schriro, 542 US at —, 124 S Ct at 2523.)
At the risk of unduly lengthening this decision, I hereinafter quote extensively from the decisions of the Supreme Court that developed the law of retroactivity. I believe that only through assessing the actual language of the Court, unalloyed by gloss or perspective, can one accurately understand the course which the doctrine of retroactivity has traversed.
The outlines of the Supreme Court doctrine of retroactivity first emerged in the case of Linkletter, wherein the Court, apparently for the first time, declined to apply retroactively a new constitutional rule (see Linkletter, 381 US at 640 [Black, J., dissenting]). The Court held that the Mapp rule did not operate retrospectively upon cases finally decided prior to the Mapp decision. Justice Clark, in an opinion on behalf of seven Justices, discussed the history and theory of the problem presented by the question of retroactivity: '
“At common law there was no authority for the proposition that judicial decisions made law only for the future. Blackstone stated the rule that the duty of the court was not to ‘pronounce a new law, but to maintain and expound the old one.’ 1 Blackstone, Commentaries 69 (15th ed. 1809). This Court followed that rule in Norton v. Shelby County, holding that unconstitutional action ‘confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed’. The judge rather than being the creator of the law was but its discoverer. Gray, Nature and Sources of the Law 222 (1st ed. 1909) . . .
“On the other hand, Austin maintained that judges do in fact do something more than discover law; they make it interstitially by filling in with judicial interpretation the vague, indefinite, or generic statutory or common-law terms that alone are but the empty crevices of the law. Implicit in such an approach is the admission when a case is overruled that the earlier decision was wrongly decided. However, rather than being erased by the later overruling decision it is considered as an existing juridical fact until overruled,, and intermediate cases finally decided under it are not to be disturbed.
“The Blackstonian view ruled English jurisprudence *772 and cast its shadow over our own as evidenced by Norton v. Shelby County, supra. However, some legal philosophers continued to insist that such a rule was out of tune with actuality largely because judicial repeal ofttime did ‘work hardship to those who [had] trusted to its existence.’ Cardozo, Address to the N. Y. Bar Assn., 55 Rep. N. Y. State Bar Assn. 263, 296-297 (1932) . . . And in 1932 Mr. Justice Cardozo in Great Northern R. Co. v. Sunburst Oil & Refining Co., applied the Austinian approach in denying a federal constitutional due process attack on the prospective application of a decision of the Montana Supreme Court. He said that a State ‘may make a choice for itself between the principle of forward operation and that of relation backward.’ Mr. Justice Cardozo based the rule on the avoidance of ‘injustice or hardship’ citing a long list of state and federal cases supporting the principle that the courts had the power to say that decisions though later overruled ‘are law none the less for intermediate transactions.’ Eight years later Chief Justice Hughes in Chicot County Drainage Dist. v. Baxter State Bank, in discussing the problem . . . reasoned that the actual existence of the law prior to the determination of unconstitutionality ‘is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration.’ He laid down the rule that the ‘effect of the subsequent ruling as to invalidity may have to be considered in various aspects.’
“Under our cases it appears (1) that a change in law will be given effect while a case is on direct review, and (2) that the effect of the subsequent ruling of invalidity on prior final judgments when collaterally attacked is subject to no set ‘principle of absolute retroactive invalidity’ but depends upon consideration of ‘particular relations . . . and particular conduct ... of rights claimed to have become vested, of status, of prior determinations deemed to have finality’; and ‘of public policy in the light of the nature both of the statute and of its previous application.’ . . .
“It is true that heretofore, without discussion, we have applied new constitutional rules to cases finalized before the promulgation of the rule. Petitioner contends that our method of resolving those prior *773 cases demonstrates that an absolute rule of retroaction prevails in the area of constitutional adjudication. However, we believe that the Constitution neither prohibits nor requires retrospective effect. As Justice Cardozo said, ‘We think the federal constitution has no voice upon the subject.’
“Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.” (Linkletter, 381 US at 622-629 [citations omitted].)
Thus the Supreme Court in Linkletter adopted a case-by-case, balancing approach to the issue of retroactivity, without distinguishing between cases on direct appeal and those deemed final. The Linkletter test required the analysis of three criteria:
1. The purpose to be served by the particular new rule;
2. The extent of reliance which had been placed upon the old rule;
3. The effect on the administration of justice of retroactive application of the new rule. (See Linkletter, 381 US at 622-629; see also Tehan v United States, 382 US 406 [1966].)
The Linkletter standard proved to be difficult to apply consistently and led to much criticism in subsequent decisions. Justice Harlan, facing application of the standard, found it too amorphous. In two dissenting opinions, in the cases of Desist v United States (394 US 244 [1969]) and Mackey v United States (401 US 667 [1971]), he set forth his views on how the issue of retroactivity should be resolved. He proposed a different approach, one that distinguished between direct and collateral review, advocating for a governing principle that new rules should always be applied retroactively to cases on direct review but that new rules should not be applied retroactively to cases on collateral review, with two exceptions. The rationale for Justice Harlan’s approach is explained primarily in the Mackey case. In the interest of clarity, I set forth here essentially in its entirety Justice Harlan’s position, since it eventually has been adopted as the modern version of the law of retroactivity:
“[I]t is sounder, in adjudicating habeas petitions, generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose *774 of all these cases on the basis of intervening changes in constitutional interpretation.
“I do not mean to neglect the force of countervailing contentions. Assuring every state and federal prisoner a forum in which he can continually litigate the current constitutional validity of the basis for his conviction tends to assure a uniformity of ultimate treatment among prisoners; provides a method of correcting abuses now, but not formerly, perceived as severely detrimental to societal interests; and tends to promote a rough form of justice, albeit belated, in the sense that current constitutional notions, it may be hoped, ring more ‘correct’ or ‘just’ than those they discarded.
“In my view, however, these interests are too easily overstated. Some discrimination must always exist in the legal treatment of criminal convicts within a system where the governing law is continuously subject to change. And it has been the law, presumably for at least as long as anyone currently in jail has been incarcerated, that procedures utilized to convict them must have been fundamentally fair, that is, in accordance with the command of the Fourteenth Amendment that ‘[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law.’ Moreover, it is too easy to suggest that constitutional updating is necessary in order to assure that the system arrives only at ‘correct’ results. By hypothesis, a final conviction, state or federal, has been adjudicated by a court cognizant of the Federal Constitution and duty bound to apply it. To argue that a conclusion reached by one of these ‘inferior’ courts is somehow forever erroneous because years later this Court took a different view of the relevant constitutional command, carries more emotional than analytic force. No one has put this point better than Mr. Justice Jackson, in his concurring opinion in Brown v. Allen, 344 U. S., at 540: ‘[R] ever sal by a higher court is not proof that justice is thereby better done. There is no doubt that if there were a super-Supreme Court, a substantial proportion of our reversals of state courts would also be reversed. We are not final because we are infallible, but we are infallible only because we are final.’
“More importantly, there are operative competing *775 policies in this area which I regard as substantial. It is, I believe, a matter of fundamental import that there be a visible end to the litigable aspect of the criminal process. Finality in the criminal law is an end which must always be kept in plain view . . . As I have stated before, ‘[b]oth the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community.’ Sanders v. United States, 373 U. S. at 24-25 (harían, J., dissenting). At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to be treated once convicted. If law, criminal or otherwise, is worth having and enforcing, it must at some time provide a definitive answer to the questions litigators present or else it never provides an answer at all. Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.
“A rule of law that fails to take account of these finality interests would do more than subvert the criminal process itself. It would also seriously distort the very limited resources society has allocated to the criminal process. While men languish in jail, not uncommonly for over a year, awaiting a first trial on their guilt or innocence, it is not easy to justify expending substantial quantities of the time and energies of judges, prosecutors, and defense lawyers litigating the validity under present law of criminal convictions that were perfectly free from error when made final. This drain on society’s resources is compounded by the fact that issuance of the habeas writ compels a State that wishes to continue enforcing its laws against the successful petitioner to re- *776 litigate facts buried in the remote past through presentation of witnesses whose memories of the relevant events often have dimmed. This very act of trying stale facts may well, ironically, produce a second trial no more reliable as a matter of getting at the truth than the first.
“In sum, while the case for continually inquiring into the current constitutional validity of criminal convictions on collateral attack is not an insubstantial one, it is by no means overwhelming. Most interests such a doctrine would serve will be adequately protected by the current rule that all constitutional errors not waived or harmless are correctible on habeas and by defining such errors according to the law in effect when a conviction became final. Those interests not served by this intermediate position are, in my view, largely overridden by the interests in finality.
“Although not necessary to the resolution of either of the two collateral cases now here, for sake of completeness I venture to add that I would make two exceptions to this general principle. First, the above discussion is written only with new ‘procedural due process’ rules in mind, that is, those applications of the Constitution that forbid the Government to utilize certain techniques or processes in enforcing concededly valid societal proscriptions on individual behavior. New ‘substantive due process’ rules, that is, those that place, as a matter of constitutional interpretation, certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, must, in my view, be placed on a different footing. As I noted above, the writ has historically been available for attacking convictions on such grounds. This, I believe, is because it represents the clearest instance where finality interests should yield. There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose. Moreover, issuance of the writ on substantive due process grounds entails none of the adverse collateral consequences of retrial I have described above. Thus, the obvious interest in freeing individuals from punishment for conduct that is constitutionally protected seems to me sufficiently substantial to justify applying cur *777 rent notions of substantive due process to petitions for habeas corpus.
“Secondly, I think the writ ought always to lie for claims of nonobservance of those procedures that, as so aptly described by Mr. Justice Cardozo in Palko v. Connecticut, 302 U. S. 319, 325 (1937), are ‘implicit in the concept of ordered liberty.’ Typically it should be the case that any conviction free from federal constitutional error at the time it became final, will be found, upon reflection, to have been fundamentally fair and conducted under those procedures essential to the substance of a full hearing. However, in some situations it might be that time and growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, will properly alter our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular conviction. For example, such, in my view, is the case with the right to counsel at trial now held a necessary condition precedent to any conviction for a serious crime. See my separate opinion in Gideon v. Wainwright . . . .” (Mackey, 401 US at 689-694 [citations omitted].)
Justice Harlan’s comprehensive analysis of the rationale of the doctrine of retroactivity vis-a-vis its relationship to the doctrine of finality was eventually adopted by the Supreme Court in Teague v Lane (489 US 288 [1989]), with one significant modification. Justice O’Connor delivered the opinion of the Court with respect to parts I, II and III of the decision and an opinion with respect to parts IV and V dealing with the issue of retroactivity in which Chief Justice William Rehnquist, Justice Scalia and Justice Anthony Kennedy joined. Justice O’Connor’s rationale for adopting Justice Harlan’s approach and the basis of her modification of Justice Harlan’s proposed rules, which was concurred in by the aforesaid Justices, is contained in part IV A of that opinion. Justice O’Connor stated:
“In our view, the question ‘whether a decision [announcing a new rule should] be given prospective or retroactive effect should be faced at the time of [that] decision.’ Mishkin, Fore ward: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 64 (1965) . . . This retroactivity determination would normally entail application of the Linkletter standard, but we believe *778 that our approach to retroactivity for cases on collateral review requires modification . . .
“[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant’s conviction became final. . .
“Not all new rules have been uniformly treated for retroactivity purposes. Nearly a quarter of a century ago, in Linkletter, the Court attempted to set some standards by which to determine the retroactivity of new rules . . .
“The Linkletter retroactivity standard has not led to consistent results. Instead, it has been used to limit application of certain new rules to cases on direct review, other new rules only to the defendants in the cases announcing such rules, and still other new rules to cases in which trials have not yet commenced. Not surprisingly, commentators have ‘had a veritable field day’ with the Linkletter standard, with much of the discussion being ‘more than mildly negative.’
“Application of the Linkletter standard led to the disparate treatment of similarly situated defendants
“Dissatisfied with the Linkletter standard, Justice Harlan advocated a different approach to retroactivity. He argued that new rules should always be applied retroactively to cases on direct review, but that generally they should not be applied retroactively to criminal cases on collateral review . . .
“In Griffith v Kentucky, 479 U. S. 314 (1987), we rejected as unprincipled and inequitable the Linkletter standard for cases pending on direct review at the time a new rule is announced, and adopted the first part of the retroactivity approach advocated by Justice Harlan . . .
“The Linkletter standard also led to unfortunate disparity in the treatment of similarly situated defendants on collateral review . . . This disparity in treatment was a product of two factors: our failure to treat retroactivity as a threshold question and the Linkletter standard’s inability to account for the nature and function of collateral review . . .
“Justice Harlan believed that new rules generally should not be applied retroactively to cases on collateral review. He argued that retroactivity for cases *779 on collateral review could ‘be responsibly [determined] only by focusing, in the first instance, on the nature, function, and scope of the adjudicatory process in which such cases arise. The relevant frame of reference, in other words, is not the purpose of the new rule whose benefit the [defendant] seeks, but instead the purposes for which the writ of habeas corpus is made available.’ . . .
“Given the ‘broad scope of constitutional issues cognizable on habeas,’ Justice Harlan argued that it is ‘sounder, in adjudicating habeas petitions, generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose of [habeas] cases on the basis of intervening changes in constitutional interpretation.’ As he had explained in Desist, ‘the threat of habeas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards. In order to perform this deterrence function, . . . the habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place.’ . . .
“We find these criticisms to be persuasive, and we now adopt Justice Harlan’s view of retroactivity for cases on collateral review. Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced . . .
“The second exception suggested by Justice Harlan — that a new rule should be applied retroactively if it requires the observance of ‘those procedures that. . . are “implicit in the concept of ordered liberty,” ’ (quoting Palko) — we apply with a modification. The language used by Justice Harlan in Mac-key leaves no doubt that he meant the second exception to be reserved for watershed rules of criminal procedure.
[Justice O’Connor hereafter quotes the language of Justice Harlan, previously quoted herein under the Mackey decision. I repeat the quote since its contextual significance is relevant.]
“ ‘Typically, it should be the case that any conviction free from federal constitutional error at the *780 time it became final, will be found, upon reflection, to have been fundamentally fair and conducted under those procedures essential to the substance of a full hearing. However, in some situations it might be that time and growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, will properly alter our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular conviction. For example, such, in my view, is the case with the right to counsel at trial now held a necessary condition precedent to any conviction for a serious crime.’ 401 U. S., at 693-694 (emphasis added).
“In Desist, Justice Harlan had reasoned that one of the two principal functions of habeas corpus was ‘to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted,’ and concluded ‘from this that all “new” constitutional rules which significantly improve the pre-existing fact-finding procedures are to be retroactively applied on habeas.’ 394 U. S., at 262. In Mackey, Justice Harlan gave three reasons for shifting to the less defined Palko approach. First, he observed that recent precedent, particularly Kaufman v. United States (permitting Fourth Amendment claims to be raised on collateral review), led ‘ineluctably ... to the conclusion that it is not a principal purpose of the writ to inquire whether a criminal convict did in fact commit the deed alleged.’ 401 U. S., at 694. Second, he noted that cases such as Coleman v. Alabama (invalidating lineup procedures in the absence of counsel), gave him reason to doubt the marginal effectiveness of claimed improvements in factfinding. 401 U. S., at 694-695. Third, he found ‘inherently intractable the purported distinction between those new rules that are designed to improve the factfinding process and those designed principally to further other values.’ Id., at 695.
“We believe it desirable to combine the accuracy element of the Desist version of the second exception with the Mackey requirement that the procedure at issue must implicate the fundamental fairness of the trial. Were we to employ the Palko test without more, we would be doing little more than importing *781 into a very different context the terms of the debate over incorporation . . . Moreover, since Mackey was decided, our cases have moved in the direction of reaffirming the relevance of the likely accuracy of convictions in determining the available scope of habeas review. Finally, we believe that Justice Harlan’s concerns about the difficulty in identifying both the existence and the value of accuracy-enhancing procedural rules can be addressed by limiting the scope of the second exception to those new procedures without which the likelihood of an accurate conviction is seriously diminished.
“Because we operate from the premise that such procedures would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge. We are also of the view that such rules are ‘best illustrated by recalling the classic grounds for the issuance of a writ of habeas corpus — that the proceeding was dominated by mob violence; that the prosecutor knowingly made use of peijured testimony; or that the conviction was based on a confession extorted from the defendant by brutal methods.’ ” (Teague, 489 US at 299-313 [citations omitted].)
Application of the Teague-Schriro Standard to the Case at Bar
I realize that this decision is already unfortunately lengthy but, as aforesaid, awareness of the actual language used by the Supreme Court to explain the parameters of retroactivity is crucial, since I have concluded that this language has been misinterpreted by the defense. As a result, the defense argues for a broader application of the rules of retroactivity than was intended by the Supreme Court.
Although Justice Blackmun, in a separate concurring opinion in Teague, disagreed with Justice O’Connor and the plurality’s modification of the second exception, which linked the concept of fundamental fairness to factual innocence, characterizing it as “dicta” (489 US at 320), in subsequent decisions the Supreme Court underscored the finite, exceptionally narrow range of this second exception pursuant to which a new procedural rule would apply retroactively in the collateral context. (See Sawyer v Smith, 497 US 227, 242 [1990]; see also United States v Mandanici, 205 F3d 519, 528 [2d Cir 2000], cert denied 531 US 879 *782 [2000].) The Second Circuit Court of Appeals also recently noted that since 1989, beginning with the rule at issue in Teague, the Supreme Court has measured at least 11 new rules, or proposed new rules of criminal procedure, against the criteria for the second exception and in every case has refused to apply the rule at issue retroactively on habeas review. (See Coleman v United States, 329 F3d 77, 89 [2d Cir 2003].)
Justice Scalia’s opinion in Schriro clearly indicates that Justice O’Connor’s modification in Teague (in which Justice Scalia concurred) was not dicta and that Justice Blackmun’s view in opposition to the modification of the second exception has not prevailed in the Supreme Court. Justice Scalia’s opinion in Schriro is significant in our analysis for a number of reasons. First, Justice Scalia, speaking for a majority of the Court in Schriro, clearly articulates the standard to be applied in determining whether or not a new procedural rule is to be applied retroactively on collateral review, as one without which the accuracy of a conviction is seriously diminished. Thus, in reference to the instant motion, the issue can be framed as whether the Roberts methodology applied in Vasquez posed an impermissibly large risk that an innocent person would be convicted. Second, Justice Scalia omits any reference in Schriro to the “less defined” Palko standard (as it is described in Teague). Further, Justice Scalia deliberately emphasizes the word “seriously” in the qualifying phrase that the new procedure be one without which the accuracy of the conviction would be seriously diminished. (See Schriro, 542 US —, 124 S Ct 2519 [2004].) Third, it is interesting to note that in the Schriro decision, which was rendered shortly after the Crawford decision (Crawford was decided March 8, 2004; Schriro was decided June 24, 2004), Justice Scalia, the author of both decisions, stated: “ ‘it is unlikely that any [new procedural rule requiring retroactive application on collateral review] . . . “ha[s] yet to emerge.” ’ ” (Schriro, 542 US at —, 124 S Ct at 2523, quoting Tyler v Cain, 533 US 656, 667 n 7 [2001], quoting Sawyer v Smith, 497 US 227, 243 [1990] [that statement was made, as aforesaid, within months of Justice Scalia’s rendering the opinion of the Court in Crawford).)
Applying the Teague-Schriro standard as stated by Justice Scalia in Schriro, the first issue to be resolved is whether the Crawford rule, which we assume for the purpose of discussion encompasses Abdela’s allocution and is a new rule, is either substantive or procedural. In overruling Roberts, Crawford *783 altered the manner in which the admissibility of testimonial statements were to be determined in the first instance. Post-Crawford, the inquiry is to be limited to a determination that the declarant was unavailable and that he or she had been subject to prior cross-examination. Absent such a finding, testimonial statements are inadmissible. Clearly, this rule is not “substantive” in that it alters the range of conduct subject to criminal proceedings but rather it regulates the manner of determining an individual’s culpability.
Thus, the Crawford rule assures not that evidence is reliable but that reliability be assured in a particular manner. Consequently, since the Crawford rule is procedural, whether or not it is to be applied retroactively depends upon whether it falls within the second exception in Teague as further elucidated in Schriro. Whether a decision of the Supreme Court overruling another decision of the same court is of “watershed” dimension is to be determined by criteria denoted in the second exception. The second exception is a modification of Justice Harlan’s Palko test, a modification that refines and refocuses the analysis and underscores the finite and exceptionally narrow range of retroactive “watershed” rules. As Justice Scalia indicated in Schriro, since new rules of procedure “do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted ... we give retroactive effect to only a small set of ‘ “watershed rules of criminal procedure” implicating the fundamental fairness and accuracy of the criminal proceeding.’ ” (542 US at —, 124 S Ct at 2523, quoting Saffle v Parks, 494 US 484, 495 [1990], quoting Teague, 489 US at 311.) This is so because new procedural rules generally have a more speculative connection to innocence than substantive ones. According to Justice Scalia, it is not sufficient that a new procedural rule is fundamental in some abstract sense, as I submit the Crawford rule and its relationship to the Sixth Amendment is, but beyond that, the rule must be one “without which the likelihood of an accurate conviction is seriously diminished.” (Teague, 489 US at 313; Schriro, 542 US at —, 124 S Ct at 2523.) In other words, applying the principles of Schriro to determine whether Crawford warrants retroactive treatment, we phrase the essential question as whether a court following Roberts’ criteria seriously diminished the likelihood of an accurate conviction.
In Vasquez, this court engaged in the then constitutionally prescribed analysis and evaluation of “other” evidence as *784 required by Roberts. It was only after such a preliminary judicial determination that the plea allocution was ruled “admissible” and thus available for the jury’s consideration with the other evidence in the case on the issue of the defendant’s guilt. In addition, the jury’s method of consideration was carefully circumscribed by limiting and cautionary instructions concerning the plea allocution itself.
Of course, the Sixth Amendment right of confrontation in the abstract is a fundamental constitutional concept. However, how the right is implemented, i.e., the manner in which it is applied, is another matter entirely. (See People v Edwards, 101 P3d 1118 [Colo Ct App 2004].) The defendant contends that Crawford is a rule of “watershed” dimension falling within the second exception of the general rule of nonretroactivity in collateral matters. It appears the term “watershed” was first used by Justice O’Connor in Teague (489 US at 311-312), in reference to Justice Harlan’s example of Gideon as the prototypical rule requiring retroactive application. In Teague, however, the Court refined the meaning of a procedural “watershed” rule moving from the generic, “less defined” Palko test to a more specific test that requires an evaluation of whether the invalidated procedure seriously undermined an accurate determination of innocence or guilt. Thus, Teague limited the umbrella of retroactivity to “those new procedures without which the likelihood of an accurate conviction is seriously diminished.” (489 US at 313.)
Further, when speaking of “fundamental” procedural rules, Justice Scalia, as noted, was careful to distinguish in Schriro between those new procedural rules which are fundamental in an abstract sense (which I submit is the nature of the Crawford rule) and those without which the likelihood of an accurate conviction is seriously diminished. Judged by that understanding of the law of retroactivity, certainly some cases may have been affected by admission of testimonial statements untested by cross-examination, even after proper application of the Roberts standard. But certainly it cannot be convincingly argued that a once constitutionally approved judicial assessment, such as required by Roberts, prior to admissibility, resulted in an impermissibly large risk that innocent individuals were wrongly convicted. Although in Crawford Justice Scalia seemingly downgrades the role of a judge in the process of determining the admissibility of testimonial statements pursuant to the Roberts criteria, by referring to it as a “mere judicial determination” (541 US at 62, 124 S Ct at 1370), in Schriro he clearly uplifts the *785 capacity of the Court to insure the justice and fairness of an ultimate decision, albeit in a different context, stating it is “implausible that judicial factfinding so ‘seriously diminished’ accuracy as to produce ‘an impermissibly large risk’ of injustice.” (Schriro, 542 US at —, 124 S Ct at 2525.)
The Crawford decision did not rest on the premise that every criminal trial or any particular trial is necessarily unfair because a judge applying the Roberts standard permitted testimonial statements in evidence as an exception to the hearsay rule, but rather that such a procedure was not conducted in accordance with a current constitutional interpretation of the requirements of the Sixth Amendment Confrontation Clause. In doing so the Court was merely affirming the right of confrontation and not creating a new right or watershed rule.
Crawford altered the range of permissible methods for determining whether a testimonial statement can be introduced into evidence without affording a defendant the right to cross-examine the declarant. The defense argues that the rule in Crawford should be applied retroactively because it is one that goes to the fundamental fairness of a proceeding. The essential flaw in this argument is that it ignores the Teague-Schriro modification of the second exception, in favor of less defined concepts. The question here is not simply whether not applying the Crawford rule had an effect on the accuracy of the proceeding but, rather, whether a judicial determination conducted pursuant to Roberts so seriously diminished accuracy that it constituted an impermissibly large risk that an innocent person would be convicted.
Certainly Crawford alters our understanding of the bedrock procedural elements of the Sixth Amendment in an abstract sense. But, as Justice Scalia noted, that is insufficient to warrant classification of the decision as one of watershed dimension. Declaring previous procedures effectuating that bedrock understanding of the meaning of the Sixth Amendment unconstitutional because they did not comport with a more current understanding of such bedrock procedure does not warrant a conclusion that Roberts was so flawed that it resulted in a serious risk that innocent individuals would be convicted by applying that standard. It is not enough that the new constitutional rule involved a “bedrock procedural element.” Collateral retroactive application requires more — a finding that in the absence of the new rule, the likelihood of an accurate conviction was seriously diminished.
*786 In my view, the certainty and frequency with which any court could say that violations of the Crawford rule resulted in an injustice to the accused differ greatly enough from the cases arising because of absence of counsel at trial (Gideon) to justify treating the Roberts rule as different in kind for the purpose of retroactive application.

People v Eastman

The defense contends this court’s decision is controlled by the Court of Appeals case of People v Eastman (85 NY2d 265 [1995]). I disagree. In Eastman, the Court was concerned with the unconstitutional introduction of a codefendant’s statements simply because they “interlocked” with the defendant’s confession, notwithstanding the use of cautionary instructions. In contrast, the Roberts procedure requires a focused judicial inquiry into the trustworthiness of a statement based on “other” evidence in the case, a safeguard of considerably more significance, accompanied by cautionary instructions. Again, the focus of the inquiry concerning retroactivity pursuant to the second Teague exception should be whether that procedure presented a serious risk that the issue of guilt or innocence might not have been reliably determined so as to warrant retroactive application. The reasoning of the Eastman case was ultimately based on the rationale underlying the case of Bruton v United States (391 US 123 [1968]). That case appropriately criticized the efficacy of cautionary instructions with respect to codefendants’ confessions. Bruton itself overruled the Supreme Court case of Delli Paoli v United States (352 US 232 [1957]), which, almost from its inception, was questioned by other courts. (See Roberts v Russell, 392 US 293 [1968].) Delli Paoli was rejected because it was not based upon a sound understanding of the capacity of a jury to disregard incriminating statements implicating a codefendant. Further, Delli Paoli did not recognize that cautionary instructions were insufficient to overcome the prejudice that would inure to the defendant because of admission of such evidence. (See Bruton, 391 US 123 [1968]; see also Roberts, 392 US 293 [1968].)
The Eastman court found that the Cruz rule cured an unconstitutional procedure that was central to a fair trial. (See Cruz v New York, 481 US 186 [1987].) It cannot be said that application of the Roberts methodology amounted to an equivalent violation, given the then sanctioned procedural safeguards. The Crawford rule recognized a marginal potential doubt concerning *787 the efficacy of convictions based upon uncross-examined testimonial statements and that is why it is subject to “harmless error” analysis.
The Eastman court cited to Graham v Hoke (946 F2d 982 [2d Cir 1991]) in concluding that the Cruz violation was central to an accurate determination of guilt or innocence. (See Eastman, 85 NY2d at 276.) But even in the Hoke case, the court clearly recognized that the Roberts rule was different in kind from the rule that permitted admission of interlocking confessions. The Hoke court stated (946 F2d at 994):
“While the right to confront and cross-examine one’s accusers is not absolute, Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990), and various exceptions to this right have been carved out through the years, Pointer, 380 U.S. at 407, 85 S.Ct. at 1069-70, the competing interests and public policy concerns that have led to these exceptions have been narrowly cabined. Chambers, 410 U.S. at 295, 93 S.Ct at 1045-46 (‘Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.’). Thus, the constitutionally prescribed ‘preference’ for direct confrontation and cross-examination, Ohio v. Roberts, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), can be dispensed with ‘only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.’ Craig, 497 U.S. at [850], 110 S.Ct. at 3166 (citations omitted).”
The Hoke court stated that “[t]he ‘bedrock procedural element’ implicated in Cruz was the right of confrontation; a right which the Supreme Court long ago referred to as being ‘[o]ne of the fundamental guarantees of life and liberty.’ ” (Hoke, 946 F2d at 994 [citation omitted].) Certainly in the abstract the Sixth Amendment Confrontation Clause constitutes a bedrock procedural element of the trial. But, as recognized in Hoke, there are exceptions to it. And one of the previously constitutionally recognized exceptions was the Roberts procedure, a procedure considered at the time of the Hoke decision to be different in kind, i.e., constitutionally sound in comparison to the procedure overruled in Cruz. Thus, the Court in Eastman did not consider whether the safeguards required in Roberts constituted *788 an impermissible violation of the defendant’s rights that went to the heart of the fairness of his trial.
Decisions of Coequal Courts
Decisions of other courts of coequal jurisdiction have found the Crawford rule to be retroactive, though harmless. (See People v Watson, 5 Misc 3d 1013[A], 2004 NY Slip Op 51364[U] [Sup Ct, NY County, Kahn, J., 2004]; People v Dobbin, 6 Misc 3d 892 [Sup Ct, NY County, Tejada, J., 2004].) Those cases dealt with the excited utterance and present sense impression exceptions, respectively, to the hearsay rule whereas this court’s analysis relates to the declaration against penal interest exception; an exception which as previously noted requires careful consideration of other corroborative evidence before admission. Although this court is not bound by decisions of courts of concurrent jurisdiction, respect for collegiality requires me to address the arguments of my learned colleagues, since I have reached a different conclusion as to retroactivity of the Crawford rule.
In the case oí People v Watson (supra), the court described the standard to be applied in determining whether or not Crawford was to be applied retroactively, in part, as whether it was a rule that constituted: “a ‘watershed rule’ of criminal procedure which is ‘implicit in the concept of ordered liberty.’ ” (Watson, 2004 NY Slip Op 51364[U], *3, quoting Teague, 489 US at 311-312.) In so doing, the court, although acknowledging the limiting language of Teague as to the second exception, did not specifically address whether the Crawford violation seriously diminished the likelihood of an accurate conviction in the context of determining retroactivity. Similarly, the court in Dobbin described the retroactivity standard it employed as follows:
“Eastman states that the second exception to the general rule is that ‘[p]ursuant to Teague, new rules of constitutional criminal procedure are applied retrospectively . . . where the new rule alters a bedrock procedural element of criminal procedure which implicates the fundamental fairness and accuracy of the trial (see, Teague v Lane, 489 US [288], at 311-312)’ and that ‘ “[a] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government; [or,] [t]o put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant’s conviction became final” *789 Teague v Lane, 489 US, at 301, supra).’ (People v Eastman, 85 NY2d 265, 275-276 [1995].)” (Dobbin, 6 Misc 3d at 900-901.)
The Teague language of import not addressed by the Watson or Dobbin courts is, to wit:
“Finally, we believe that Justice Harlan’s concerns about the difficulty in identifying both the existence and the value of accuracy-enhancing procedural rules can be addressed by limiting the scope of the second exception to those new procedures without which the likelihood of an accurate conviction is seriously diminished.” (Teague, 489 US at 313.)
Nor did those courts specifically address the language used by Justice Scalia in Schriro wherein he indicated that abstract recognition of fundamental concepts is insufficient. The court in Watson interpreted Eastman as holding that:
“[I]n New York ... a new federal constitutional criminal procedural rule announced by the United States Supreme Court will be given retroactive application to cases on collateral review, where the new rule alters our understanding of the Sixth Amendment right of confrontation, affects the fundamental fairness of the trial and is central to an accurate determination of innocence or guilt.” (Watson, 2004 NY Slip Op 51364[U], *6.)
The rule in Crawford, in my view, although it altered our understanding of the Sixth Amendment in the abstract, did not affect the fundamental fairness of a trial to the extent that it seriously diminished the accuracy of a conviction. In that sense it was not central to an accurate determination of innocence or guilt. Consequently, I disagree with the Watson and Dobbin courts’ analysis of the law of retroactivity with respect to the holding in Crawford. In my view, Watson and Dobbin applied a much broader standard than intended by the Supreme Court as evidenced by both Teague and Schriro in determining questions of retroactivity.
The Watson court also quoted Justice Scalia’s language in Crawford which seemingly downplayed the role of a judge applying the Roberts method of assessing reliability. But reference to Justice Scalia’s subsequent holding in Schriro indicates that he acknowledged the value of a judicial determination in the context of a death penalty case, stating:
“While DeStefano was decided under our pre-Teague *790 retroactivity framework, its reasoning is germane. We noted that although ‘the right to jury trial generally tends to prevent arbitrariness and repression^] . . . “[w]e would not assert . . . that every criminal trial — or any particular trial — held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury.” ’ 392 U.S., at 633-634 (quoting Duncan, supra, at 158). We concluded that ‘[t]he values implemented by the right to jury trial would not measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right to jury trial.’ 392 U.S., at 634. If under DeStefano a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be.” (Schriro, 542 US at —, 124 S Ct at 2525-2526.)
The Roberts rule required judicial engagement in a careful analysis to safeguard the accuracy of the verdict, a procedural apparatus not considered in the Cruz or Eastman ruling. Nor was the impact of that procedure on the likelihood of an accurate conviction discussed in Watson or Dobbin, in determining the issue of retroactivity.
In conclusion, the Sixth Amendment right to cross-examination is indeed fundamental to our system of criminal justice, but as Justice Scalia stated in Schriro, “it does not follow that, when a criminal defendant has had a full trial and one round of appeals in which the State faithfully applied the Constitution as we understood it at the time, he may nevertheless continue to litigate his claims indefinitely in hopes that we will one day have a change of heart.” (Schriro, 542 US at —, 124 S Ct at 2526.)
Consequently, I hold that Crawford announced a new procedural rule that does not apply retroactively to cases already final on direct review.
Defendant’s motion pursuant to CPL 440.10 is denied in its entirety.